UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Rebecca Colmer, individually
as beneficiary, and as Personal
Representative of the Estate of
Philip Colmer,

    Plaintiff,

v.

                    CASE NO. 20-12263
                    HON. DENISE PAGE HOOD

Administrative Concepts and
ACE American Insurance Co.,

    Defendants.
_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD [#25], DENYING PLAINTIFF'S MOTION TO OVERTURN DENIAL OF BENEFITS [#27], and GRANTING MOTION FOR LEAVE TO FILE EXHIBIT [#33]**

**I.    INTRODUCTION**

Plaintiff Rebecca Colmer, individually as beneficiary and as Personal Representative of the Estate of Philip Colmer ("Plaintiff"), commenced this ERISA action by filing a complaint against Defendants Administrative Concepts, Inc. and ACE American Insurance Company ("Defendants") in the Circuit Court for Washtenaw County, Michigan. Defendants timely removed the case to this Court on August 20, 2020. On March 2, 2022, Defendants filed a Motion for Judgment on the Administrative Record [ECF No. 25], and Plaintiff filed a Motion to

Overturn Denial of Benefits. [ECF No. 27] The Motions are fully briefed, and a hearing on the Motions was held on May 11, 2022.

## II. BACKGROUND

Plaintiff's husband, Philip Colmer ("Colmer"), died while piloting a private aircraft (the "Subject Aircraft") on August 20, 2019. Colmer was insured, and Plaintiff was a beneficiary, on a policy issued by Defendant ACE American Insurance Company (the "Policy"). The insurance policy is governed by Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant Administrative Concepts, Inc. denied Plaintiff's claim pursuant to the Policy on October 1, 2019.

The Defendants' basis for the denial of benefits under the Policy was that Plaintiff's decedent was "test flying" the Subject Aircraft that crashed and caused his death. Defendants declared that such conduct precluded coverage under the Policy because of the following "Exclusions" provision in the Policy:

> **We will not pay benefits for any loss or Injury that is caused by, results from, or is contributed to by**:
>
> * * * * *
>
> 8. Travel or flight in any vehicle used for aerial navigation, if any of these apply:
>
>    a) an aircraft certified by the FAA as experimental, restricted or limited, or as a prototype aircraft;
>    b) **an aircraft being used for** waivered flying, crop

    dusting, **test flying**, flight instruction or participation in speed or endurance contests;
 c) an aircraft being used for stunt flying (other than performing legal aerobatic flying specifically approved by the FAA for such purposes and in an area and at an altitude approved by the FAA); while flying for hire, except D or any of its subsidiaries; or while flying in violation of any FAA regulations; or
 d) **an aircraft that is not equipped, inspected, certified, or maintained in accordance with FAA regulations**.

ECF No. 24, **ADMIN00469** (emphasis added). Defendants initially cited the National Transportation Safety Board's ("NTSB") statement in the NTSB Aviation Accident Preliminary Report ("Preliminary Report") that Plaintiff's decedent was conducting a "maintenance test flight" at the time of the accident for determining that Colmer was "test flying." Plaintiff appealed the denial to Defendants on October 31, 2019, as required by the Policy. Defendants denied Plaintiff's appeal on February 27, 2020. Defendants continued to assert the flight was a "test flight," although they recognized that the accident flight was the second flight of the day for the Subject Aircraft (both piloted by Colmer).

  On or about July 24, 2020, Plaintiff filed this action alleging that she was entitled to death benefits under the Policy because Colmer was not conducting a "test flight." Defendants removed the action to this Court on August 20, 2020. On May 3, 2021, Plaintiff's counsel sent a letter to the NTSB, asking the NTSB to correct and amend the Preliminary Report to eliminate any findings or statements

that Colmer was conducting a test flight at the time of the accident. On September 16, 2021, the NTSB published its final accident report ("Final Report"). ECF No. 24, PageID. **417, 419**. The Factual Information section of the Final Report stated the following:

> The airplane was originally equipped with a Continental IO-520-A engine and a McCauley two-bladed propeller. The airplane was modified by the installation of a Continental IO-550-F engine and a McCauley three-bladed propeller. The engine and propeller modification is typically recorded on a Federal Aviation Administration (FAA) Form 337, "Major Repair and Alteration," and adopted by a field approval. Neither the form nor maintenance records regarding the modification were found during the investigation.

*Id*. at **ADMIN00421**.

In the Final Report, the term "maintenance test flight" that was set forth in the Preliminary Report was removed, was not referenced, and was replaced by the term "post maintenance check flight," as follows:

> The airplane had undergone recent maintenance, during which the passenger had installed a field-overhauled engine and a three-bladed propeller. The pilot, who was seated in the left seat, and passenger, who was seated in the right seat, were conducting a post maintenance check flight. The accident was the second flight of the day in the accident airplane. Before the first flight, the airplane was filled with 34.4 gallons of fuel. It could not be determined if any adjustments or maintenance items were accomplished on the airplane after the first flight and before the accident flight.

ECF No. 24, **ADMIN00419**. The NTSB reported that there were no records that the FAA had approved the new overhauled engine, ECF No. 24, **(Admin 421)**.

In the Final Report, the NTSB reached the following conclusion as to the cause of the accident:

> During examination of the engine, the air filter element was found displaced and lodged in the intake. The metal screen used to hold the filter element was found improperly installed. The evidence indicates that the improper installation of the metal screen allowed the filter element to become displaced and subsequently lodged in the intake, which blocked the intake air and resulted in a total loss of engine power.

*Id*. at **ADMIN00417**.

On January 4, 2022, Plaintiff filed a second appeal with Defendants based on the NTSB's Final Report. Defendants denied Plaintiff's January 4, 2022 appeal on February 16, 2022, citing Exclusion 8 to the Policy, namely the following provisions of that section: "(b) an aircraft being used for waivered flying, crop dusting, test flying, flight instruction or participation in speed or endurance contests; and . . . (d) an aircraft that is not equipped, inspected, certified or maintained in accordance with FAA regulations."

On May 5, 2022, after the parties had fully briefed the Motions, Defendants received from the NTSB a response to a letter Defendants submitted to the NTSB on September 23, 2021. In the September 23, 2021 letter, Defendants inquired regarding the NTSB's change in terminology from the Preliminary Report to the Final Report, specifically "maintenance test flight" being changed to "post

maintenance check flight." The May 3, 2022 NTSB letter stated:

> The phrase "test flight" was changed to "check flight" in the final report consistent with language contained in 14 Code of Federal Regulations section 91.407, "Operation after maintenance, preventive maintenance, rebuilding, or alteration," which states, in part, that "no person may carry any person (other than crewmembers) in an aircraft that has been maintained, rebuilt, or altered…until an appropriately rated pilot…makes an **operational check** [emphasis added] of the maintenance performed." These terms are used interchangeably; therefore, there is no change to the relevant findings of the investigation as reflected in the final report.

ECF No. 33-1, PageID.808 (emphasis in the NTSB letter).[1]

### III.  STANDARD OF REVIEW

Defendants argue that the standard of review is whether their denial of benefits to Plaintiff was arbitrary and capricious; Plaintiff maintains that the standard of review should be *de novo*. ERISA actions are reviewed either under the abuse of discretion standard or de novo standard. First, a court must determine whether a "benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). When no discretionary authority is given to the administrator, the *de novo* standard applies. Under the *de novo* standard, no discovery is allowed, extrinsic evidence is excluded, and the court's review is limited to the administrative record. *Wilkins v. Baptist Healthcare Sys.*

---

[1] The Court GRANTS Defendants' Motion for Leave to File Exhibit [#33], and it also concludes that Plaintiff may

6

*Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (limiting evidence to that presented to administrator); *Putney v. Medical Mutual of Ohio*, 11 F.App'x 803, 807 (6th Cir. 2004) ("As a general rule, in a claim to recover benefits, a court cannot consider evidence outside the administrative record").

Defendants believe the only issue for the Court in determining the applicable standard of review is to ascertain whether the Policy grants Defendants discretionary authority, something Defendants contend does not require an overt statement in the Policy that the insurer has discretion. Citing *Bragg v. ABN AMRO North America, Inc.*, 579 F.Supp.2d 875, 889 (E.D. Mich. 2008). Defendants identify numerous provisions in the Policy where the language is consistent with language courts in the Sixth Circuit have found afford the insurer discretion. *See* ECF No. 26, PageID. 666-67 (citing ECF No. 24, **Admin 54, 63, 65, 67, 68)**.

Plaintiff notes that the language identified by Defendants is in a section of the Policy (the "Additional Benefits" section) that is not implicated by Plaintiff's claim for benefits, so it does not bear on Defendants' discretion with respect to the operative section ("Accidental Death and Dismemberment Benefits"). Plaintiff contends that, although Defendants seem to be aware of how to draft language that affords them discretion (as evidenced by doing so in the Additional Benefits

---

file Exhibits 1 and 2 (Defendants' initial letter and Mr. Rambo's supplemental affidavit) attached to Plaintiff's Response to the Motion for Leave to File Exhibit [#34].

section), terminology that would afford Defendants such discretion in the Accidental Death and Dismemberment Benefits section is "glaringly absent." Plaintiff cites no authority for this position, though she does note that several other Circuits have held that the requirement to submit "satisfactory proof" (one of the terms Defendants rely upon to claim they have discretion) does not insulate an administrator from *de novo* review. *See, e.g., See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 414 (3d Cir. 2011).

Defendant declines to adopt Plaintiff's position, as that could create a rule that discretionary authority does not apply to the policy as a whole, but must be separately determined for each individual policy provision. *Policies are construed as a whole, thus any coverage analysis involves terms and provisions from different parts of a policy. Plaintiff also argues that the "Claim Provisions" section referenced by Defendants does not contain discretionary language. (ECF No. 29, PageID 751). The "Claim Provisions", though, also apply to the entire policy, including to the "Additional Benefits." Therefore, is Plaintiff suggesting that Chubb has discretion with respect to the "Additional Benefits" provisions, but not with respect to the "Claims Provisions" that apply equally to the "Additional Benefits" coverage? Furthermore, policy provisions often incorporate defined terms. Under Plaintiff's argument, an insurer with discretion to construe a*

8

*provision generally might not have discretion to construe defined terms incorporated into that provision if those defined terms themselves do not separately grant the insurer discretion in the definitions section of a policy. Or, a provision without discretion might have defined terms incorporated where an insurer did have discretion with respect to the defined terms. Insurers could not possibly consistently apply their policy terms under such a piecemeal framework. An insurer is either meant to have such discretion with respect to a policy (as evidenced by examples within the policy) or not. Any other approach does not make a shred of practical sense.*

Plaintiff next contends that Defendants' opposition to allowing Plaintiff any discovery is a basis for imposing *de novo* review. Plaintiff notes that narrow discovery is regularly allowed when the abuse of discretion standard is applied. Citing *Johnson v. Connecticut Gen. Life Ins. Co.*, 324 F. App'x 459, 467 (6th Cir. 2009); *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 431 (6th Cir. 2006); *Kmatz v. Metro. Life Ins. Co.*, 458 F. Supp. 2d 553, 561 (S.D. Ohio 2005). Plaintiff asserts that "the need for discovery increases where the insurance company serves as plan administrator as well as payor of benefits," so the arbitrary and capricious standard may be applied rather than the *de novo* standard. Citing *Sundermeyer v. Ohio Educ. Ass'n,*, No. 2:12-CV-959, 2013 WL 3147952, (S.D. Ohio June 19,

2013). In *Sundermeyer*, the primary dispute was dependent on the interpretation of the term "retire." The court allowed limited discovery and compelled the defendant to answer plaintiff's limited discovery requests within the scope of the defendant's interpretation of the term "retire." Plaintiff states that she requested the same allowance, first in correspondence with the Defendant on March 18, 2021, secondly, before the Court in Plaintiff's opposition to the amending of the scheduling order on May 3, 2021, and, finally, during a hearing on amending the scheduling order held on May 12, 2021. Defendant repeatedly denied that any discovery, no matter how narrow, was allowed. Plaintiff concludes that, as the Court is limited to the evidence that was presented before the administrator, the Court should review the case *de novo*.

The Court finds that Defendants' decision should be reviewed under the arbitrary and capricious standard. In reviewing the administrative record and the parties' Motions, however, the Court concludes that, even under a *de novo* review, Defendants are entitled to judgment in this matter.

IV. **ANALYSIS**

In *Firestone*, courts are directed to use contract law in construing the terms of the plan and other manifestations of the parties' intent. *Firestone*, 489 U.S. at 112- 13. Any ambiguity in the language of the contract must be construed against

its drafter. *United Rentals (N.A.), Inc. v. Keizer*, 355 F.3d 399, 409 (6th Cir.2004). If a contract's "language is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning," then it is ambiguous as a matter of law. *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019).

Defendants first basis for denial of Plaintiff's claim was that Colmer was conducting a "test flight." ECF No. 24, PageID. **ADMIN00443-46**). Defendants claim their determination is based on what the NTSB concluded: Colmer was performing a post-engine installation flight for purposes of checking the aircraft in flight after major maintenance. Defendants cite Plaintiff's allegation in her complaint that Colmer "volunteered to fly the Subject Accident Aircraft for approximately ten hours after all maintenance had been completed." ECF No. 1-1, PageID.12. Defendants state that the improper maintenance that caused the engine failure on the Subject Aircraft is precisely the type of riskier flight that they excluded from coverage. Plaintiff argues that Defendants' s interpretation of "test flight" has no basis in law or the well-established meaning in the context of aviation, so the Court should overturn Defendants' denial of benefits.

It is undisputed that "test flying" or "test flight" is not defined in the Policy, nor is it defined in the Federal Air Regulations ("FARs"), which govern the rules

and regulations of aviation in the United States. 14 C.F.R. Part 91. In its denial letter, Defendants defined "test flight" as "*any* post-maintenance flight for the purpose of testing the plane post-maintenance." (emphasis in original). Plaintiff argues that, under Defendants' proposed rule, any flight post maintenance is a test flight, such that all flights following an annual inspection would be considered test flights, which Plaintiff claims is not sensical.

Defendants contend that the "test flying" exclusion is unambiguous and therefore should be enforced as written, even though it is not defined. Defendants argue that the plain meaning of the term is easily gleaned: that it means flying for the purpose of testing an aircraft for a variety of reasons. Defendant maintains that, regardless of the wording (especially since the change in terms has now been declared immaterial by the NTSB), the NTSB concluded that the purpose of the flight at issue was to "check" the plane after performing significant maintenance, which included installation of a new overhauled engine and propeller. (*Id*. at ADMIN00417, ADMIN00419). Flying a plane for this purpose under this circumstance is "test flying" under any reasonable construction of its plain meaning. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (courts must apply plain meaning).

Defendants emphasize that the NTSB expressly concluded that the flight

was made for purposes of a maintenance check after major maintenance. For that reason, Defendants argue that it is irrelevant whether the FAA required a test flight after the maintenance was conducted because the NTSB concluded its purpose was due to check on that maintenance. Defendants note that section b) of Section 8 of the Exclusions did not refer to the FAA or a specific FAA regulation, as sections a), c), and d) do. For that reason, Defendants argue, the Court should not read any FAA requirement into section b). Richard A. Lord, *Williston on Contracts* § 31:5 (4th ed. 2007) ("Courts should not add words to a contract under the guise of construing it.").

Defendants note that Plaintiff's complaint states that Colmer "had volunteered to fly the Subject Accident Aircraft for approximately ten hours after all maintenance had been completed." ECF No. 1, PageID.12. The Court agrees that the statement is consistent with the NTSB's finding that the purpose of Colmer's flight was to test the aircraft after the new overhauled engine and propeller were installed.

Although there is no applicable law regarding the definition of "test flying" or "test flight," Defendants cite a case where an insurer denied coverage under an exclusion for "testing the aircraft" where the plane crashed during a flight in which a potential buyer was trying out the plane as a condition of sale. *Ohio General Ins*.

13

*Co. v. Woods*, 1991 WL 640067, *1 (N.D. Fl. June 25, 1991).

> **[T]his was not a case where the craft had been experiencing problems, so that a flight was necessary to see if those problems had been adequately repaired. Nor had the craft been recently fitted with new or experimental equipment. Because of the added risks involved in those kind of flights . . . it makes sense that aviation insurance policies would exclude them**. The fact that a potential buyer is riding along for evaluative purposes, however, does not increase the risk in any way, and no plausible reason exists for excluding such a flight.

*Id*. at *4 (emphasis added). While the facts of *Ohio General* are not relevant here, the court's language suggests "test flight" has a broad meaning and that flying a repaired aircraft or an aircraft with new equipment would qualify as a "test flight," consistent with insurers' general intent to exclude private flights with enhanced risks. The Court finds this argument persuasive and concludes that "test flying" does not apply only to "test flying" of an experimental aircraft or test flights mandated by law, as Plaintiff suggests.

Plaintiff makes several arguments why the last flight of the Subject Aircraft should not have been determined a "test flight." Plaintiff argues that the "test flying" exclusion does not apply because no test flight was mandated by the FAA, but there is no basis in the plain language of the Policy that supports such an interpretation. The FAA regulation cited by Plaintiff does not define "test flight." It only mandates when one is required by law (and when one is not required). ECF

No. 27, PageID 735-36. As Defendants assert, the fact that a post-maintenance flight is not required by the FAA regulation does not mean such a flight is not a test flight.

As Defendant logically and reasonably concluded, if a pilot flies an aircraft following major maintenance for purposes of testing or checking the aircraft's performance following that maintenance (as the NTSB specifically found had occurred with respect to Colmer and the Subject Aircraft), that can still be "test flying." In other words, a flight does not cease to be a "test flight" merely because the FAA did not require such a flight by law.

Plaintiff states that the Subject Aircraft's engine was started and performed extensive running on the ground prior to the accident flight (engine run up), which in itself would be sufficient to be considered airworthy. Plaintiff also argues that the Subject Aircraft was flown in the morning on a flight prior to the accident flight, implying that because one flight had occurred after the new overhauled engine and propeller were installed, no subsequent flight should be considered a "test flight." In the instant case, however, the NTSB concluded that the subject flight – the second flight of the day – was a "post maintenance check flight" following installation of a new overhauled engine and propeller. The Court finds, as the NTSB did, that a flight could not be considered "test flying" (a test flight)

15

just because it is a second (or subsequent) flight performed after maintenance work, as Plaintiff insinuates should be the rule. For those reasons, Defendants, when adhering to a reasonable, plain reading of "test flying," could determine that the second flight qualified as a "test flight."  The Court makes this finding, particularly as no part of the "test flying" exclusion refers to or is any way linked to the FAA regulation cited by Plaintiff.[2]

Plaintiff asserts that Defendants' internal emails show that they initially stated that denying Plaintiff's claim based on the test flight exclusion after the performance of an annual inspection was not within the "intent" of the test flight exclusion. ECF No. 24, PageID.295. Plaintiff complains that it was only after the NTSB published the Preliminary Report Defendants denied her claim based on the exclusion.  The Court finds that Plaintiff's reliance on that email lacks significance.  The person authoring that email specifically referenced "annual

---

[2] Plaintiff argues that Colmer was not a test pilot, but that is not relevant because the purpose of the flight (i.e., whether it was "test flying"), not Colmer's credentials, is what must be evaluated when determining whether the "test flying" exclusion applies.  Plaintiff argues that Colmer had a passenger on the Subject Aircraft at the time of the accident flight, but the Court finds that, if relevant, the passenger would be considered a crewmember.  As set forth in the Preliminary Report, the other person in Subject Aircraft at the time of the accident flight was "[t]he pilotrated passenger, seated in the right seat, was also a mechanic who had performed the recent work on the airplane." ECF No. 24, PageID.415.

The Court notes Plaintiff states that Colmer flew the Subject Aircraft "for approximately ten hours after maintenance had been completed and before the accident flight." ECF No. 27, PageID 730.  Plaintiff does not cite to the record to support this statement, and the Complaint only mentions that Colmer had volunteered to do so. Defendants represent that they are not aware of any evidence that Colmer flew the Subject Aircraft for ten hours after the new

maintenance," which was information gleaned from "news reports" published about the accident. The email was drafted on September 11, 2019, only three weeks after the accident and before the NTSB even issued the Preliminary Report. The Court finds that "annual maintenance" likely is significantly different than maintenance to install a new overhauled engine and propeller, the maintenance that the NTSB determined had been performed shortly before the accident flight.

Plaintiff has consulted an FAA certified aircraft mechanic and pilot, Harold Rambo, Jr. as an expert, and Rambo supplied an affidavit that challenges and contradicts Defendants' conclusion that the accident flight was a "test flight." Mr. Rambo explains that an FAA Form 337 was not required in this situation because of a pre-existing Supplemental Type Certificate ("STC"), which "did not require a test or check flight." The administrative record, however, contains no STC, nor have Defendants apparently been provided one with respect to the Subject Aircraft.

Mr. Rambo notes the NTSB's removal of "test flight" from the Final Report, where the NTSB instead used "post maintenance check flight." Whether the NTSB used the term "maintenance test flight" or "post maintenance check flight," it seems clear that the NTSB consistently found that the purpose of the flight at issue was to check the Subject Aircraft in flight following major maintenance (installing in a new overhauled engine and a propeller). The NTSB's May 3, 2022

---

overhauled engine and propeller were installed but prior to the accident flight.

17

letter recently clarified that "maintenance test flight" and "post maintenance check flight" mean the same thing, as "the terms are used interchangeably."

The Court finds that Colmer's flight constituted "test flying" under any reasonable, plain meaning construction of the exclusion. Even construing "test flight" in the aviation context, as Plaintiff urges the Court to do, the Court finds that no specific FAA regulation needs to be read into the exclusion simply because such regulation does not already exist there. The FAA regulations do not define "test flying," ECF No. 30, PageID. 781, and merely indicates when one is required.

The second basis for denial of Plaintiff's claim was that the Policy contains an exclusion when an aircraft "is not equipped, inspected, certified, or maintained in accordance with FAA regulations." ECF No. 24, PageID. **ADMIN00069)**. In the Final Report, the NTSB stated that the engine and propeller modification performed on the Subject Aircraft would "typically [be] recorded on a Federal Aviation Administration (FAA) Form 337, 'Major Repair and Alteration,' and adopted by a field approval." *Id*. at **ADMIN00417, ADMIN00421**. The NTSB found no record of the modification or approval, *id.*, and Plaintiff never provided Defendants with any such records.

Defendants assert that the second basis for denial was the result of a straightforward application of the Policy's language to facts -- use of an aircraft

18

that was not inspected, certified, or maintained in accordance with FAA regulations, as excluded under part d) of Section 8. Defendants applied the exclusion because there was no record that the new engine overhaul was recorded with and approved by the FAA—in fact, there were no records whatsoever concerning the maintenance. It cannot be disputed that the new engine overhaul constituted a scenario with an elevated risk profile. Based on the NTSB categorizing the new engine overhauls as a "Major Repair and Alteration," it was reasonable of Defendants to conclude that the risk was heightened and that exclusion d) applied based on the express FAA requirements and the NTSB's factual findings.

## IV. CONCLUSION

For the reasons stated above,

IT IS ORDERED that Defendants' Motion for Judgment on the Administrative Record [ECF No. 25] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion to Overturn Denial of Benefits [ECF No. 27] is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Leave to File Exhibit [ECF No. 33] is GRANTED.

Judgment shall be entered accordingly.

Dated: September 30, 2022              s/Denise Page Hood
                                   DENISE PAGE HOOD
                                   UNITED STATES DISTRICT JUDGE